**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

| | |
|---|---|
| **GINA R. LIPARI-WILLIAMS, MARISSA T. HAMMOND, and LUCINDA M. LAYTON, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**PENN NATIONAL GAMING, INC.,**<br><br>**THE MISSOURI GAMING COMPANY, LLC d/b/a ARGOSY RIVERSIDE CASINO, and**<br><br>**ST. LOUIS GAMING VENTURES, LLC d/b/a HOLLYWOOD CASINO ST. LOUIS**<br><br>**Defendants.** | **Case No. 5:20-CV-6067-SRB**<br><br>**DEMAND FOR JURY TRIAL** |

## THIRD AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15 and the Court's Order (Doc. 60), Gina R. Lipari-Williams, Marissa T. Hammond, and Lucinda M. Layton (collectively, "Plaintiffs") file this Third Amended Class and Collective Action Complaint against Penn National Gaming, Inc. ("PNG"), The Missouri Gaming Company, LLC d/b/a Argosy Riverside Casino ("Argosy Riverside"), and St. Louis Gaming Ventures, LLC d/b/a Hollywood Casino St. Louis ("Hollywood Casino St. Louis") (collectively, "Defendants").

1.      Plaintiff Lipari-Williams commenced this action in the Circuit Court of Platte County, Missouri on March 31, 2020 in a matter captioned *Lipari-Williams v. The Missouri Gaming Company, LLC, et al.*, Case No. 20AE-CC00099. Defendants were served with process on April 2, 2020 by personally serving their registered agent, CT Corporation System, with a copy

1

of the state court petition and summonses. Defendants removed this matter on May 1, 2020 on the basis of alleged traditional diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). *See* Notice of Removal, Doc. 1 at ¶ 8. Defendants asserted complete diversity existed between the named parties and that Plaintiff Lipari-Williams, individually, would necessarily incur, at least, $75,000 in reasonable attorneys' fees. *See id.* at ¶¶ 22-28.

## NATURE OF ACTION

2. This is a class and collective action concerning three unlawful employment practices occurring at Defendant PNG's casino properties.

3. *First*, Defendants deducted from the wages of Plaintiffs and all other similarly situated employees the costs to obtain and thereafter maintain and renew state-issued gaming licenses. This practice violates both federal and Missouri law. As multiple federal district courts (including this Court) have held, these gaming licenses are primarily for the benefit and convenience of the employers (here, Defendants). As such, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, these gaming license costs may not be deducted from an employee's wages to the extent the deductions bring the employee's wages below the federally-mandated $7.25 per hour minimum wage. Likewise, the gaming license deductions are not for the "private benefit of the employees." As such, pursuant to the Missouri Minimum Wage Law ("MMWL"), RSMo. § 290.500, *et seq.*, these gaming license costs may not be deducted from an employee's wages to the extent the deductions bring the employee's wages below the Missouri minimum wage. Because Plaintiffs and all other similarly situated employees have been paid at or below the federal and Missouri minimum wage rates, the gaming license deductions necessarily reduced their wages below the minimum wage in violation of both statutes. Plaintiffs assert the

2

gaming license deduction claims as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), and class actions pursuant Federal Rule of Civil Procedure 23.

4. *Second*, Defendants have created a mandatory tip pooling policy by which Defendants require their table games dealers to pool their tips and then, in violation of the FLSA and MMWL, distribute those tips to the table games dealers who earned them as well as to pay the Paid Time Off ("PTO") of certain non-tipped, manager and supervisor employees. This practice violates the express language of the FLSA prohibiting tip pooling whereby employees "who customarily and regularly receive tips" share tips with non-tipped employees who do not. *See* 29 U.S.C. 203(m)(2)(A)(ii). Likewise, this practice violates the express language of the FLSA prohibiting the employer from keeping any portion of its employees' tips, "including allowing managers or supervisors to keep any portion of employees' tips." *See* 29 U.S.C. 203(m)(2)(B). In addition, this practice violates the MMWL because these table games dealers who earned the tips are not being allowed to "retain[] compensation in the form of gratuities" as provided for under the MMWL. *See* RSMo. § 290.512(1). As a result, Defendants are not entitled to a tip credit under federal or Missouri law meaning Plaintiffs and all similarly situated employees are entitled to the difference between their direct cash wage and the federal and/or applicable Missouri minimum wage, whichever is greater. In addition, under the FLSA, Plaintiffs and all similarly situated employees are entitled to recover the wrongfully diverted tips.

5. *Third*, Defendant PNG breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. At all relevant times, Defendant PNG has been the sponsor of a health plan to provide eligible employees and retirees of Defendant PNG with health care benefits. Since, at least, 2014, the health plan has included an outcome-based wellness program based on a health factor within the meaning of

3

ERISA.  The wellness plan included a tobacco surcharge for employees enrolled in company-sponsored medical coverage who have used tobacco products within the last three months or have participating dependents who have used tobacco products within the last three months.  The Tobacco Surcharge has been in place since, at least, 2014.  Since 2019, the Tobacco Surcharge has been $23.08 per bi-weekly pay period ($50 per month) for one tobacco user, and $46.15 per bi-weekly pay period ($100 per month) for two tobacco users.  However, if employees or their dependents enroll in a smoking cessation program, they are eligible to have the tobacco surcharge removed upon completion of the smoking cessation program.  *But* any adjustments by PNG are on a *prospective* basis only – there are no retroactive adjustments to the tobacco user surcharge.  In order to satisfy the requirement to provide a reasonable alternative standard, the same, full reward from an outcome-based wellness program must be available to individuals who qualify by satisfying a reasonable alternative standard as is provided to individuals who qualify by satisfying the program's otherwise applicable standard.  In other words, all similarly situated employees must be allowed to obtain the *full* reward (*i.e.*, completely avoiding the tobacco surcharge) through the reasonable alternative.  Because PNG refuses to make retroactive adjustments to the tobacco surcharge, individuals have not and will not receive the full amount of the reward – the tobacco surcharge will only be removed after completion of the smoking cessation program through the remainder of the plan year.  As a result, PNG has failed to satisfy the requirement to provide a reasonable alternative standard to its outcome-based wellness program based on a health-status factor (tobacco).  Because Defendant PNG failed to offer a reasonable alternative standard for the Tobacco Surcharge, it has operated an illegal and discriminatory outcome-based wellness program because it discriminates on the basis of a health-status related factor (namely, tobacco use).  This

4

constitutes a breach of ERISA's fiduciary duties, and Defendant PNG must, among other things, disgorge all Tobacco Surcharges it obtained through its breach of fiduciary duty.

## PARTIES

6.      Plaintiff Gina R. Lipari-Williams resides in Platte City, Missouri, and is a resident of the State of Missouri.  Plaintiff Lipari-Williams was previously employed by Defendants at their Argosy Riverside property located in Platte County, Missouri.  Plaintiff Lipari-Williams' Consent to Join was previously filed with the Court. *See* Doc. 24-1.

7.      Plaintiff Marissa T. Hammond resides in St. Charles County, Missouri and is a resident of the State of Missouri.  Plaintiff Hammond was previously employed by Defendants at their Hollywood Casino St. Louis property located in St. Louis County, Missouri.  Plaintiff Hammond's Consent to Join was previously filed with the Court. *See* Doc. 24-2.

8.      Plaintiff Lucinda M. Layton resides in Clay County, Missouri and is a resident of the State of Missouri.  Plaintiff Layton is currently by Defendants at their Argosy Riverside property located in Platte County, Missouri.

9.      Defendant Argosy Riverside is a limited liability company organized under the laws of the State of Missouri with its principal place of business in Platte County, Missouri.

10.      Defendant Hollywood Casino St. Louis is a limited liability company organized under the laws of the State of Delaware with its principal place of business in St. Louis County, Missouri.

11.      Defendant PNG is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Wyomissing, Pennsylvania.

5

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over Defendants Argosy Riverside and Hollywood Casino St. Louis because their principal places of business are located within the State of Missouri, they transact business within the State of Missouri, they enter into contracts within the State of Missouri, and they are authorized by the Missouri Secretary of State to do business within the State of Missouri.

13.     This Court has personal jurisdiction over Defendant PNG because it transacts business within the State of Missouri, it enters into contracts within the State of Missouri, and it is authorized by the Missouri Secretary of State to do business within the State of Missouri. For example, Defendant PNG possesses an approved casino operator's license issued by the Missouri Gaming Commission because it owns and operates three casinos in Missouri.

14.     The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. The Court possesses subject matter jurisdiction over Plaintiffs' FLSA claims based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. The Court likewise has subject matter jurisdiction over Plaintiffs' state-law wage and hour claims because they are so related to the FLSA claims that they form part of the same case and controversy, satisfying supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.     ERISA authorizes actions by private parties to recover damages for violations of the statute's fiduciary duties. The Court possesses subject matter jurisdiction over Plaintiffs Hammond and Layton's ERISA claims based upon 29 U.S.C. §§ 1132(a)(1) and (e)(1) and 28 U.S.C. § 1331.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this judicial district and Defendants are each

6

subject to personal jurisdiction in this district. Plaintiff Lipari-Williams worked for Defendants at their Argosy Riverside property, which Defendants operate within the Western District of Missouri.

<u>**COMMON ALLEGATIONS REGARDING FLSA AND MMWL VIOLATIONS**</u>

**PNG Jointly Employed Plaintiffs and All Others Similarly Situated**

17.    PNG operates a hub and spoke employment structure whereby, PNG, at the operational center of the wheel, has spokes leading out to each of its individual casino subsidiaries, including Argosy Riverside and Hollywood Casino St. Louis (collectively, the subsidiary casino entities). By design, each individual subsidiary casino entity is the acknowledged employer of the employees, like Plaintiffs, who physically work at the casino property. However, as a matter of economic reality, from its position at the operational center of this structure, PNG has the ability to and, in fact, does operate its subsidiary casinos and instructs the entities on how and when to execute employment policies. The subsidiaries casino entities must and do follow PNG's operational instructions. Due to the pervasive control PNG both possesses and exercises over the employees at each of its casinos (both directly and indirectly), PNG is a joint employer of Plaintiffs and all others similarly situated, along with each respective subsidiary casino entity, like Argosy Riverside.

18.    There is no material difference between the manner in which PNG treats each of its casino properties or the Plaintiffs (and those who are similarly situated to them) who work at each of the PNG casino properties. Each of the casino properties is akin to a regional office of PNG's nationwide gaming operation with PNG in control and directing the policies and procedures across the country that affect the day-to-day lives of Plaintiffs and all other similarly situated employees.

7

19.     At all relevant times, PNG, with and through the individual subsidiary casino entities, jointly employed each Plaintiff (and other similarly situated employees) because:

a.     PNG had the right to and did exercise control over the hiring and firing of Plaintiffs and all other similarly situated employees;

b.     PNG had the right to and did supervise the work schedules, conditions of employment, and the manner in which Plaintiffs and all other similarly situated employees performed their jobs;

c.     PNG had the right to and did determine the rate and method of payment for Plaintiffs and all other similarly situated employees; and

d.     PNG was primarily responsible for and did maintain the employment records for Plaintiffs and all other similarly situated employees.

**The Gaming License Deductions Are Unlawful and Primarily Benefit the Employers**

20.     As owners and operators of gaming establishments (*i.e.*, casinos) within the State of Missouri, Defendants are subject to the provisions of Missouri law governing riverboat gambling and their interpreting regulations.  *See* RSMo. § 313.800, *et seq*.; *see also* Mo. Code Regs. Ann. tit. 11, § 45-4.010, *et seq*.

21.     Defendants must ensure their employees possess Occupational Gaming Licenses in order to conduct Defendants' casino businesses.  Without licensed employees, Defendants' Missouri casinos could not function.  *See* Mo. Code Regs. Ann. tit. 11, § 45-4.010.

22.     Pursuant to the Missouri Gaming Commission's regulations, Level I Occupational Gaming Licenses cost $1,000 for an application fee and $100 for an annual license fee.  Level II Occupational Gaming Licenses cost $75 for an application fee and $50 for an annual license fee. *See* Mo. Code Regs. Ann. tit. 11, § 45-4.380.

8

23. Defendants have established a uniform gaming license deduction policy that governs all employees at its Missouri casinos.

24. Under this policy, Defendants deduct from their employees' wages the amount it costs Defendants to initially obtain and thereafter renew the employees' state-issued gaming licenses.

25. With respect to the FLSA, Defendants may only deduct these gaming license costs from their employees' wages if the costs are primarily for the benefit of employees. However, Defendants' employees' state-issued gaming licenses are primarily for the benefit or convenience of Defendants. Defendants' casinos exist in a heavily regulated environment. For example, Defendants can only have table games in their casinos if they are operated by employees (table games dealers) who have the required state-issued gaming license. These state-issued gaming licenses are specifically required for the employee's performance of the employer's particular business. Without these state licensed employees, Defendants could not compliantly operate their casinos and, in turn, generate the revenues needed to support their operations and realize profits. Also, courts interpreting the requirements of 29 C.F.R. § 531.35 ("Free and clear" payment; "kickbacks") and 29 C.F.R. § 531.32 ("Other facilities") have drawn a line between costs arising from employment itself and those arising in the ordinary course of life. Costs that "primarily benefit the employee" are universally ordinary living expenses that one would incur in the course of life outside the workplace. Occupational licensing costs—like the state-issued gaming license at issue here—arise out of employment rather than the ordinary course of life. To that end, Plaintiffs and other similarly situated employees have no use for their gaming license in the ordinary course of life outside the workplace. Therefore, Defendants' employees' state-issued

gaming license primarily benefits the employer, not the employee, and cannot be deducted from their wages where, as here, it plainly creates a minimum wage violation.

26. The analysis of the FLSA minimum wage claim is the same as that of the MMWL minimum wage claim because the MMWL "follow[s] the written regulations established by the United States Department of Labor pertaining to the Fair Labor Standards Act." *See* Mo. Code Regs. Ann. tit. 8, § 30-4.010. Like the FLSA, the MMWL only permits certain deductions to be credited as minimum wages if they are "for the private benefit of the employee." *See* Mo. Code Regs. Ann. tit. 8, § 30-4.050.

27. Given that Defendants' gaming license deductions primarily benefit Defendants (as opposed to Plaintiffs and similarly situated employees), Defendants may not deduct the gaming license costs from employees' wages to the extent they create a minimum wage violation under the terms of the FLSA or MMWL.

28. For Defendants' many employees, like Plaintiffs, who are paid a direct cash wage of $7.25 per hour (the federally required minimum wage) or less, which include, among others, Defendants' tipped employees (like Plaintiffs) for whom Defendants pay a sub-minimum direct cash wage and claim an FLSA section 3(m) tip credit, this gaming license deduction is unlawful because it necessarily reduces the employee's earnings below the required minimum wage or overtime compensation in the workweeks in which Defendants make the deduction, resulting in violations of the FLSA.

29. As the Department of Labor has explained, when an employer claims an FLSA section 3(m) tip credit, the tipped employee is considered to have been paid only the minimum wage for all non-overtime hours worked in a tipped occupation and the employer may not take

Case 5:20-cv-06067-SRB   Document 62   Filed 02/26/21   Page 10 of 46

deductions because any such deduction reduces the tipped employee's wages below the minimum wage.

30. This is not the first time a federal district court has considered the applicability of the FLSA to the common casino industry practice of deducting the costs of obtaining and renewing gaming licenses from employees' wages in the context of minimum wage violations.

31. In *Lockett v. Pinnacle Entertainment, Inc.*, 408 F. Supp. 3d 1043 (W.D. Mo. 2019), Judge Fenner found "[t]he necessity of a gaming license arises out of employment, and therefore, it primarily benefits Defendants, as employers. Accordingly, the FLSA prohibits the deduction of any cost or fee for the gaming license." *Id*. at 1049. In *Lockett*, the Court likewise found that, because the named plaintiffs were tipped employees earning a direct cash wage of $7.24 or less, any deduction necessarily created a minimum wage violation. *Id*. at 1048-49.

32. In *Lilley v. IOC-Kansas City, Inc.*, 2019 WL 5847841 (W.D. Mo. Nov. 7, 2019), this Court found "considering Plaintiffs' factual allegations in the context of the DOL regulations and caselaw, the gaming license fee is a cost arising from employment and not arising in the ordinary course of life. Plaintiffs have satisfied their burden at this early stage in the litigation to plead facts that would support the conclusion that the gaming license fee primarily benefits Defendant and, therefore, may not be deducted from wages to the extent the fee brings an employee's pay below the minimum wage required by the FLSA and [Missouri Minimum Wage Law]." *Id*. at *3.

33. Likewise, the Department of Labor announced in November 2018 that it had completed an investigation and concluded that a casino operator's deductions made from employees' wages to cover its costs for individual employee's casino gaming licenses created minimum wage violations when those deductions brought the employee's pay below the federal

Case 5:20-cv-06067-SRB   Document 62   Filed 02/26/21   Page 11 of 46

minimum wage of $7.25 per hour. In that case, the casino operator was required to pay $175,128 in back wages and damages to 889 employees at its casinos.

34. Defendants deducted gaming license fees from Plaintiff Lipari-Williams' wages during the pay period ending on March 14, 2019. During this pay period, Defendants deducted a gaming license fee in the amount of $25.00 from Plaintiff Lipari-Williams' wages. During this pay period, Plaintiff Lipari-Williams was paid a direct cash wage of $6.386 per hour. This wage is below the federal minimum wage of $7.25 per hour and the then-applicable Missouri minimum wage of $8.60 per hour. Under these circumstances and for purposes of the FLSA and MMWL, any deduction from Plaintiff Lipari-Williams' wages, including the unlawful gaming license deduction at issue, constitutes a minimum wage violation.

35. Similarly, Defendants deducted gaming license fees from Plaintiff Hammond's wages during the pay period ending on May 30, 2019. During this pay period, Defendants deducted a gaming license fee in the amount of $25.00 from Plaintiff Hammond's wages. During this pay period, Plaintiff Hammond was paid a direct cash wage of $5.6456 per hour. This wage is below the federal minimum wage of $7.25 per hour and the then-applicable Missouri minimum wage of $8.60 per hour. Under these circumstances and for purposes of the FLSA and MMWL, any deduction from Plaintiff Hammond's wages, including the unlawful gaming license deduction at issue, constitutes a minimum wage violation.

36. Pursuant to 29 U.S.C. § 216(b), "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." As Defendants violated the FLSA's minimum wage and/or overtime compensation provisions through an illegal gaming license

12

deduction, Plaintiffs and all others similarly situated are entitled to recover their unpaid minimum wages or overtime compensation, along with an additional equal amount as liquidated damages.

37.     Defendants' FLSA violations alleged herein were willful in that Defendants either knew of the specific FLSA requirements and prohibitions at issue at the time of the alleged violations and intentionally did not comply with them, or showed reckless disregard for the matter of whether their conduct violated the FLSA.  For example, Defendants have been aware of Judge Fenner's decision in *Lockett* holding gaming licenses are primarily for the benefit of the employer and may not be deducted where it creates a minimum wage violation since the decision was issued and has continued to deduct the cost of gaming licenses from its employees' wages since that opinion was issued.  Further, Defendants have also intentionally or recklessly ignored case law from the Southern District of New York issued in 2013 that expressly holds that occupational licensing costs are primarily for the benefit of the employer and, therefore, cannot be deducted from an employee's wages if the deduction reduces the employee's earnings below the required minimum wage or overtime compensation. *See Williams v. Secure Resource Communication Corp.*, 2013 WL 4828578 (S.D.N.Y. Sept. 10, 2013).

**Defendants' Tip Pooling Violations**

38.     Plaintiff Lipari-Williams is table games dealer who participates in mandatory tip pooling arrangement at Defendants' Argosy Riverside property.  Plaintiff Hammond was a table games dealer who participated in a mandatory tip pooling arrangement at Defendants' Hollywood Casino St. Louis property.  Defendants have operated an unlawful tip pooling arrangement in violation of the FLSA and MMWL by including a category of employees commonly referred to as "Dual-Rate Supervisors" in the tip pool as explained below.

13

39. PNG has established a uniform or substantially similar Paid Time Off ("PTO") policy that governs PTO for hourly employees at its casinos, including Argosy Riverside and Hollywood Casino St. Louis.

40. PNG's PTO policy provides that PTO hours accrue for every hour worked based on the employee's length of service with PNG according to a set schedule.

41. Defendants jointly employ certain workers under the job title "Dual-Rate Supervisor" (or its equivalent by any other name), which includes employment in two occupations: (1) floor supervisor; and (2) table games dealer. The Department of Labor refers to this type of employment as a "dual job" situation.

42. With respect to their employment as a floor supervisor (a non-tipped occupation), these employees are paid a regularly hourly rate (say, $19 per hour). Defendants classify full-time floor supervisors (who perform the same job duties as dual rate supervisors when Dual-Rate Supervisors are functioning in their floor supervisor role) as exempt pursuant to the executive and/or administrative exemption. Hours worked in their employment as a floor supervisor are specifically tracked and separately paid as such in Defendants' timekeeping and payroll records.

43. With respect to Dual-Rate Supervisors' employment as a table games dealer (a tipped occupation that participates in a mandatory tip pooling arrangement with Plaintiffs and other similarly situated employees), Defendants pay a sub-minimum direct cash wage. Under the FLSA, the sub-minimum direct cash wage must be at least $2.13 per hour, and the employer is able to count a limited amount of the employee's tips (as re-distributed by the employer to the employee under a valid tip pooling arrangement) as a partial credit to satisfy the difference between the direct cash wage and the required federal minimum wage (known as a "tip credit"), *see* 29 U.S.C. § 203(m)(2)(A). The credit allowed on account of tips may be less than that permitted by statute,

14

but it cannot be more. To illustrate, if Defendants pay a table games dealer a sub-minimum direct cash wage of say $4.25 per hour, the amount of the "tip credit" would be $3 (the difference between the employee's direct cash wage of $4.25 and the federal minimum wage of $7.25) – on the assumption further that the amount of tips actually received by the tipped employee (as re-distributed by Defendants according to the mandatory tip pooling arrangement) is enough to make up the difference between the employee's direct cash wage and the federal minimum wage; if not, Defendants must make up the difference to ensure the employee is paid at least the required minimum wage for all hours worked in their employment as a table games dealer.

44. Under the FLSA, when an employer employs someone in both a tipped and non-tipped occupation, the tip credit is available only for the hours the employee works in the tipped occupation. Thus, for Defendants' Dual-Rate Supervisors, the hours worked in the tipped occupation (table games dealer) must be tracked and paid separately from the hours worked in the non-tipped occupation (floor supervisor).

45. Dual-Rate Supervisors accrue PTO in a single pot. This means there is not one pot for PTO accrued as a tipped, hourly table games dealer, on the one hand, and a separate pot for PTO accrued as a non-tipped and manager/supervisor Dual-Rate Supervisor, on the other hand. Instead, the PTO earned by Dual-Rate Supervisors simply accrues in a single pot.

46. For Dual-Rate Supervisors, Defendants do not track how their PTO was accrued. However, when Dual-Rate Supervisors take PTO, they are paid PTO out of the table games dealers' tip pool. The PTO hours accrued in their employment as a floor supervisor (a non-tipped occupation and managerial and supervisory position) should not properly included in any valid tip pooling arrangement among table games dealers (like Plaintiff). But that is precisely what Defendants are doing for their own economic benefit and to the detriment of these employees.

15

47.     Defendants also unlawfully redistribute a portion of the table games dealers' tips to Dual-Rate Supervisors when they are paid for such things as jury duty, bereavement leave, sick leave, FMLA leave, and the like, which accrue and/or are paid in the same or substantially similar unlawful manner as the PTO described above.  To the extent Dual-Rate Supervisors accrue such additional paid leave in their employment as a floor supervisor, those hours cannot be included as part of any valid tip pooling arrangement among table games dealers.

48.     Defendants' above-described scheme for the payment of PTO hours (and other forms of paid leave) for Dual-Rate Supervisors is unlawful and violates the FLSA's tip-pooling provisions because (1) Defendants are violating the FLSA's requirement that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement; (2) Defendants are violating the FLSA's prohibition against the pooling of tips among employees who do not customarily and regularly receive tips; and (3) Defendants are violating the FLSA's requirement that it "not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of the employees' tips, regardless of whether or not the employer takes a tip credit" – *see* 29 U.S.C. § 203(m), as amended by the Consolidated Appropriations Act, 2018 (signed March 23, 2018), along with such section as was in effect prior to then, and all applicable regulations (as the position title Dual-Rate Supervisor and Floor Supervisor confirm, when Dual-Rate Supervisors are performing their non-tipped supervisory duties they are "managers or supervisors" within the meaning of the FLSA).

49.     Defendants' above-described scheme also results in Defendants' violation of the FLSA's minimum wage payment requirements, 29 U.S.C. § 206, because Defendants are paying a direct cash wage to table games dealers (including Plaintiff) that is less than the required minimum wage, and, due to Defendants' non-compliance with the FLSA's tip-pooling provisions,

16

Defendants are not entitled to any credit using employees' tips against its minimum wage obligation with respect to Plaintiffs, and other similarly situated employees.

50. For the same reasons, Defendants' above-described tip pooling practice also violates the MMWL. Pursuant to the MMWL, an employer may only pay a sub-minimum direct cash wage to an employee "who receives and retains compensation in the form of gratuities in addition to wages…" *See* RSMo. § 290.512(1). Defendants' tip pooling practices violate the MMWL because employees are not retaining tips within the meaning of the MMWL when tips are redistributed from the mandatory tip pool to non-tipped employees and manager/supervisor employees in the form of PTO. Due to these violations, Defendants may not claim a tip credit and may not pay a direct cash wage below Missouri's minimum wage meaning Defendants owe Plaintiff and all similarly situated employees the difference between their direct cash wage and the then-applicable minimum wage.

51. Because Defendants' FLSA violations as alleged herein were neither sporadic nor infrequent, Defendants' tip pooling arrangement for table games dealers should be invalidated for the entire statutory look-back period of three (3) years. Alternatively, and at a minimum, Defendants' tip pooling arrangement for table games dealers should be invalidated as to any pay period during the statutory look-back period of three (3) years in which Defendants unlawfully kept and then improperly redistributed table games dealers' tips to pay PTO hours (or other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor.

52. As a result of Defendants' above-described FLSA violations, and pursuant to 29 U.S.C. § 216(b), Plaintiffs and other similarly situated employees are entitled to recover from Defendants the amount of the sum of (1) the tip credit taken (*i.e.*, the difference between the direct cash wage and the required federal minimum wage) / the amount of the unpaid minimum wages,

17

(2) all tips that were unlawfully kept by Defendants and then improperly redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor, and (3) an additional equal amount as liquidated damages.

53.     Defendants' FLSA violations alleged herein were willful in that Defendants either knew of the specific FLSA requirements and prohibitions at issue at the time of the alleged violations and intentionally did not comply with them, or showed reckless disregard for the matter of whether their conduct violated the FLSA.  By way of example, Defendants recognize, by their own pay policies, that Dual-Rate Supervisors are not permitted to participate in the table games dealers' tip pool for regular hours earned in their capacity as floor supervisors.  Under the circumstances, it demonstrates willful violations of the FLSA, or at least reckless disregard for the FLSA, to include other compensation (e.g., PTO, bereavement leave, sick leave, etc.) accrued by Dual-Rate Supervisors in their role as floor supervisors for payment from the table games dealers' tip pool.

54.     Plaintiffs and other similarly situated employees are also entitled under the FLSA, 29 U.S.C. § 216(b), to recover a reasonable attorney's fee to be paid by the Defendants, and costs of this action.

<u>**CLASS AND COLLECTIVE ACTION ALLEGATIONS**</u>

55.     Plaintiffs Lipari-Williams and Hammond bring Count I, the FLSA claim arising out of Defendants' unlawful gaming license deduction policy, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves individually and the following collective action class:

**Fair Labor Standards Act Collective – Gaming License Deduction**

All persons employed and paid a direct cash wage of $7.25 per hour or less at PNG casinos Argosy Casino Riverside and Hollywood Casino St. Louis, and for whom

18

a deduction was taken from their wages (or if the employee paid directly) for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from three years preceding the filing of the Complaint.

56.    Plaintiffs Lipari-Williams and Hammond bring Count II, the FLSA claim arising out of Defendants' illegal tip pooling policy, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of herself individually and the following collective action class:

**Fair Labor Standards Act Collective – Illegal Tip Pooling**

All persons employed as table games dealers at PNG casinos Argosy Casino Riverside and Hollywood Casino St. Louis who participated in the table games dealer tip pool, at any time from three years preceding the filing of the Complaint.

57.    Plaintiffs' FLSA claims (Count I and II) may be pursued by those who opt-in to this case, pursuant to 29 U.S.C. § 216(b).  Plaintiffs, individually and on behalf of all others similarly situated, seek relief on a collective basis challenging Defendants' above-described FLSA violations.  The number and identity of other plaintiffs yet to opt-in and consent to be party plaintiffs may be determined from Defendants' records, and potential opt-in plaintiffs may easily and quickly be notified of the pendency of this action by U.S. Mail, email, text message, and posting an approved notice.

58.    Plaintiffs bring Counts III, IV, V, VI, and VII as class actions pursuant to Federal Rule of Civil Procedure 23 on behalf of four classes.

59.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs Lipari-Williams and Hammond bring Count III on behalf of themselves and the following class:

**Missouri Minimum Wage Law Class – Gaming License Deductions**

All persons currently or formerly employed in hourly positions at Defendants' Argosy Riverside and/or Hollywood St. Louis properties and for whom a deduction was taken from their wages (or if the employee paid directly) for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license when the employee's direct cash wage was equal to or less than the then-

19

applicable state minimum wage, at any time from three years prior to the filing of the Complaint to the present.

60.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs Lipari-Williams and Hammond bring Count IV on behalf of themselves and the following class:

**Missouri Minimum Wage Law Class – Illegal Tip Pooling**

All persons employed as table games dealers at PNG casinos Argosy Casino Riverside and Hollywood Casino St. Louis who participated in the table games dealer tip pool, at any time from three years preceding the filing of the Complaint to the present.

61.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs Lipari-Williams and Hammond bring Count V on behalf of themselves and the following class:

**Missouri Breach of Contract Class – Gaming License Deductions**

All persons currently or formerly employed in hourly positions at Defendants' Argosy Riverside and/or Hollywood St. Louis properties and for whom a deduction was taken from their wages (or if the employee paid directly) for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from five years prior to the filing of the Complaint to the present.

62.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs Lipari-Williams and Hammond bring Count VI on behalf of themselves and the following class:

**Missouri Unjust Enrichment/Quantum Meruit Class – Gaming License Deductions**

All persons currently or formerly employed in hourly positions at Defendants' Argosy Riverside and/or Hollywood St. Louis properties and for whom a deduction was taken from their wages (or if the employee paid directly) for any amount associated with initially obtaining or thereafter renewing a state-issued gaming license, at any time from five years prior to the filing of the Complaint to the present.

63.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs Hammond and Layton bring Count VII on behalf of themselves and the following class:

**ERISA Class – Tobacco Surcharge**

All participants in Defendant PNG's health plan who paid a tobacco surcharge, at any time from six years prior to the filing of the Complaint to the present.

64.     Plaintiffs' MMWL claims (Count III and IV), breach of contract claim (Count V), unjust enrichment/quantum meruit claim (Count VI), and Plaintiffs Hammond and Layton's ERISA claim (Count VII) as described in detail below, satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action pursuant to Federal Rule of Civil Procedure 23.

65.     These classes each number in the hundreds, if not thousands, of persons.  As a result, joinder of all class members in a single action is impracticable.  Class members may be informed of the pendency of this action through U.S. Mail, e-mail, text message, and posting of an approved notice.  Further, members can readily be identified by records Defendants, as employers, are required to maintain.

66.     There are common questions of fact and law to the classes that predominate over any questions affecting only individual class members.  The questions of law and fact common to the classes arising from Defendants' actions include, without limitation, the following:

a.      Whether Defendants failed to pay Plaintiffs and class members minimum wage within the meaning of the Missouri Minimum Wage Law when they deducted gaming license fees from their wages;

b.      Whether Defendants failed to pay Plaintiffs and class members overtime wages within the meaning of the Missouri Minimum Wage Law when they deducted gaming license fees from their wages;

c.      Whether the gaming license fees are for the private benefit of Plaintiffs and class members such that they may be credited as wages;

21

d.  Whether Defendants claimed a tip credit pursuant to the Missouri Minimum Wage Law against their Missouri minimum wage obligations;

e.  Whether Defendants included non-tipped and/or manager/supervisor employees in the table games dealer tip pool;

f.  Whether Defendants' tip pooling practices violated the Missouri Minimum Wage Law;

g.  Whether Defendants breached their contracts with Plaintiffs and class members by failing to pay them for all hours worked by virtue of deducting the gaming license fees from their wages;

h.  Whether Defendants were unjustly enriched by virtue of deducting the gaming license fees from Plaintiffs' and class members' wages;

i.  Whether Defendant PNG offered participants in its health plan a reasonable alternative to the Tobacco Surcharge;

j.  Whether Defendant PNG offered all similarly situated participants in its health plan the ability to obtain the same full reward of its outcome-based wellness program;

k.  Whether Defendant PNG disclosed to health plan participants any alternative to the Tobacco Surcharge in all of its health plan materials; and

l.  Whether Defendant PNG breached its fiduciary duties with respect to the Tobacco Surcharge.

67.  The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the state law claims.

68.     Plaintiffs Lipari-Williams and Hammond's wage and hour claims are typical of those of the respective classes in that class members have been employed in the same or similar positions as Plaintiffs, were subject to the same unlawful gaming license fee deduction practices as Plaintiffs, and were subject to the same unlawful tip pooling procedures as Plaintiffs.

69.     Plaintiffs Hammond and Layton's ERISA claim is typical of those of all class members because all class members have been subject to the Tobacco Surcharge under the same or similar circumstances.

70.     A class action is the superior method for the fair and efficient adjudication of Plaintiffs' claims. Defendants have acted or refused to act on grounds generally applicable to the classes. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of class members to protect their interests.

71.     Plaintiffs are adequate representatives because they are members of each of the classes they seek to represent, and their interests do not conflict with the interests of the members of those classes. The interests of the members of the classes will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who are experienced prosecuting complex wage and hour, employment, and class action litigation, including, specifically, gaming license fee deduction claims.

72.     Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of the classes who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in

23

consistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

## COUNT I

### Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*.

**Gaming License Deduction Policy**

**(All Plaintiffs assert this claim against all Defendants)**

73.     At all relevant times, Plaintiffs and all others similarly situated have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201, *et seq*.

74.     The FLSA regulates, among other things, the payment of minimum wage and overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  *See* 29 U.S.C. § 206(a); 29 U.S.C. § 207(a)(1).

75.     Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are both enterprises engaged in interstate commerce and their employees are engaged in commerce.  At all relevant times, each Defendant is or has been an enterprise engaged in commerce or in the production of goods or services for commerce within the meaning of 29 U.S.C. § 203(s)(1), and, upon information and belief, has had an annual gross volume of sales made or business done of not less than $500,000.

76.     At all relevant times, Defendants were "employers" of Plaintiffs and all similarly situated employees within the meaning of the FLSA.  *See* 29 U.S.C. § 203(d).

77.     At all relevant times, Plaintiffs and all similarly situated employees were Defendants' "employees" within the meaning of the FLSA.  *See* 29 U.S.C. § 203(e).

24

78.     Plaintiffs and all similarly situated employees are covered, non-exempt employees within the meaning of the FLSA.  Accordingly, Plaintiffs and all similarly situated employees must be paid minimum wages in accordance with 29 U.S.C. § 206.

79.     Pursuant to the FLSA, employees are also entitled to be compensated at a rate of not less than one and one-half times the regular rate at which such employees are employed for all work performed in excess of 40 hours in a workweek.  *See* 29 U.S.C. § 207(a).

80.     Although the FLSA contains some exceptions (or exemptions) from the minimum wage and overtime requirements, none apply here.

81.     Plaintiffs and all similarly situated employees are victims of uniform or substantially similar compensation policies and practices.

82.     By deducting the cost of gaming licenses (whether initially obtaining, renewing, or maintaining) from the wages of Plaintiffs and all similarly situated employees, Defendants have caused minimum wage violations given that Plaintiffs and all similarly situated employees are paid a direct cash wage of $7.25 or less.  Further, the deductions are primarily for the benefit of Defendants (as opposed to Plaintiffs and all similarly situated employees) such that they may not be deducted.

83.     Plaintiffs and all similarly situated employees are entitled to damages equal to the mandated minimum wage within the three (3) years preceding the filing of the First Amended Class and Collective Action Complaint plus periods of equitable tolling, because, as described above, Defendants acted willfully and knew, or showed reckless disregard of, whether their conduct was prohibited by the FLSA.

84.     Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Plaintiffs and

other similarly situated employees are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith or with reasonable grounds in failing to pay minimum wage, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

85. As a result of these violations of the FLSA's minimum wage provisions, compensation has been unlawfully withheld by Defendants from Plaintiffs and all similarly situated employees. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

    a.   conditional and final collective action certification of Plaintiffs' FLSA claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

    b.   damages for unpaid minimum wages and overtime under 29 U.S.C. § 216(b);

    c.   reasonable attorneys' fees under the 29 U.S.C. § 216(b);

    d.   liquidated damages and/or pre-judgment interest;

    e.   costs of suit under 29 U.S.C. § 216(b); and

    f.   any further relief that the Court may deem just and equitable.

## COUNT II

## Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*.

### Illegal Tip Pooling Policy

### (All Plaintiffs assert this claim against all Defendants)

86.     At all relevant times, Plaintiffs and all others similarly situated have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201, *et seq*.

87.     The FLSA regulates, among other things, the payment of minimum wage and overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. *See* 29 U.S.C. § 206(a); 29 U.S.C. § 207(a)(1).

88.     Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are both enterprises engaged in interstate commerce and their employees are engaged in commerce. At all relevant times, each Defendant is or has been an enterprise engaged in commerce or in the production of goods or services for commerce within the meaning of 29 U.S.C. § 203(s)(1), and, upon information and belief, has had an annual gross volume of sales made or business done of not less than $500,000.

89.     At all relevant times, Defendants were "employers" of Plaintiffs and all similarly situated employees within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

90.     At all relevant times, Plaintiffs and all similarly situated employees were Defendants' "employees" within the meaning of the FLSA. *See* 29 U.S.C. § 203(e).

91.     Plaintiffs and all similarly situated employees are covered, non-exempt employees within the meaning of the FLSA. Accordingly, Plaintiffs and all similarly situated employees must be paid minimum wages in accordance with 29 U.S.C. § 206.

27

92. Pursuant to the FLSA, employees are also entitled to be compensated at a rate of not less than one and one-half times the regular rate at which such employees are employed for all work performed in excess of 40 hours in a workweek. *See* 29 U.S.C. § 207(a).

93. Although the FLSA contains some exceptions (or exemptions) from the minimum wage and overtime requirements, none apply here.

94. Plaintiffs and all similarly situated employees are victims of uniform or substantially similar compensation policies and practices.

95. As described above, Defendants operated an illegal tip pool by including non-tipped and/or manager/supervisor employees in the tip pool. As a result, Defendants may not claim a tip credit against their obligations to pay minimum wage. Pursuant to 29 U.S.C. § 216(b), Plaintiffs and other similarly situated employees are entitled to recover from Defendants the amount of the sum of (1) the tip credit taken (i.e., the difference between the direct cash wage and the required federal minimum wage) / the amount of the unpaid minimum wages, and (2) all tips that were unlawfully kept by Defendants and then improperly redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor.

96. Plaintiffs and all similarly situated employees are entitled to damages equal to the mandated minimum wage within the three (3) years preceding the filing of the First Amended Class and Collective Action Complaint plus periods of equitable tolling, because, as described above, Defendants acted willfully and knew, or showed reckless disregard of, whether their conduct was prohibited by the FLSA.

97. Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Plaintiffs and

other similarly situated employees are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith or with reasonable grounds in failing to pay minimum wage, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

98. As a result of these violations of the FLSA's minimum wage provisions, compensation has been unlawfully withheld by Defendants from Plaintiffs and all similarly situated employees. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

    a. conditional and final collective action certification of Plaintiffs' FLSA claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

    b. damages for unpaid minimum wages and overtime under 29 U.S.C. § 216(b);

    c. reasonable attorneys' fees under the 29 U.S.C. § 216(b);

    d. liquidated damages and/or pre-judgment interest;

    e. costs of suit under 29 U.S.C. § 216(b); and

    f. any further relief that the Court may deem just and equitable.

**Violation of the Missouri Minimum Wage Law, RSMo. §§ 290.500, *et seq.***

**Gaming License Deduction Policy**

**(All Plaintiffs assert this claim against all Defendants)**

99.     At all times relevant, Plaintiffs and the class members have been entitled to the rights, protections, and benefits provided under the Missouri Minimum Wage Law, RSMo. §§ 290.500, *et seq.*

100.     The Missouri Minimum Wage Law regulates, among other things, the payment of minimum wage and overtime wages by employers, subject to limited exceptions not applicable herein, and provide or have provided for during part or all of the applicable limitations period for a higher minimum wage than that provided for under federal law.  RSMo. §§ 290.500(3), (4); RSMo. § 290.505.1.

101.     The Missouri Minimum Wage Law should be construed in accordance with its provisions and those of the Fair Labor Standards Act ("FLSA").  Specifically, the Missouri Department of Labor has promulgated regulations providing that except as otherwise provided by Missouri law, the interpretation and enforcement of The Missouri Minimum Wage Law follows the FLSA and its companion regulations.  *See* 8 C.S.R. § 30-4.010(1).

102.     During all times relevant to this action, Defendants were the "employer" of Plaintiffs and the class members within the meaning of the Missouri Minimum Wage Law.  RSMo. §§ 290.500(3), (4).

103.     During all times relevant to this action, Plaintiffs and the class members were Defendants' "employees" within the meaning of the Missouri Minimum Wage Law.  RSMo. § 290.500(3).

30

104.    Plaintiffs and the class members are covered, non-exempt employees within the meaning of the Missouri Minimum Wage Law.  Accordingly, employees are entitled to be paid at least minimum wage for all hours worked in each workweek.  RSMo. § 290.502.1.

105.    Pursuant to the Missouri Minimum Wage Law, employees are also entitled to be compensated at a rate of not less than one and one-half times the regular rate at which such employees are employed for all work performed in excess of 40 hours in a workweek.  RSMo. § 290.505.1.

106.    Although the Missouri Minimum Wage Law contains some exceptions (or exemptions) from the minimum wage and overtime pay obligations, none apply here.  RSMo. § 290.500(3).

107.    Plaintiffs and the class members are victims of uniform and employer-based compensation policies, specifically the deduction of the cost of obtaining and thereafter maintaining a gaming license from their wages.

108.    Plaintiffs and the Class are entitled to damages equal to all unpaid regular and overtime wages due within three years preceding the filing of the Class Action Petition, plus periods of equitable tolling, along with an additional amount as treble damages, less any amount actually paid to the employees by Defendants.  RSMo. § 290.527.

109.    Plaintiffs and the Class are also entitled to an award of pre-judgment and post-judgment interest at the applicable legal rate.

110.    Defendants are also liable to Plaintiffs and the Class for costs and reasonable attorney fees incurred in this action.  RSMo. § 290.527.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

31

a.  class action certification of Plaintiffs' MMWL claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

b.  damages for unpaid minimum wages and overtime under RSMo. § 290.527;

c.  reasonable attorneys' fees under RSMo. § 290.527;

d.  treble damages, liquidated damages, and/or pre-judgment interest pursuant to the MMWL under RSMo. § 290.527;

e.  costs of suit under RSMo. § 290.527; and

f.  any further relief that the Court may deem just and equitable.

## COUNT IV

### Violation of the Missouri Minimum Wage Law, RSMo. §§ 290.500, *et seq.*

#### Illegal Tip Pooling

#### (All Plaintiffs assert this claim against all Defendants)

111.  At all times relevant, Plaintiffs and the class members have been entitled to the rights, protections, and benefits provided under the Missouri Minimum Wage Law, RSMo. §§ 290.500, *et seq*.

112.  The Missouri Minimum Wage Law regulates, among other things, the payment of minimum wage and overtime wages by employers, subject to limited exceptions not applicable herein, and provide or have provided for during part or all of the applicable limitations period for a higher minimum wage than that provided for under federal law.  RSMo. §§ 290.500(3), (4); RSMo. § 290.505.1.

113.  The Missouri Minimum Wage Law should be construed in accordance with its provisions and those of the Fair Labor Standards Act ("FLSA").  Specifically, the Missouri Department of Labor has promulgated regulations providing that except as otherwise provided by

Missouri law, the interpretation and enforcement of The Missouri Minimum Wage Law follows the FLSA and its companion regulations. *See* 8 C.S.R. § 30-4.010(1).

114.    During all times relevant to this action, Defendants were the "employer" of Plaintiffs and the class members within the meaning of the Missouri Minimum Wage Law.  RSMo. §§ 290.500(3), (4).

115.    During all times relevant to this action, Plaintiffs and the class members were Defendants' "employees" within the meaning of the Missouri Minimum Wage Law.  RSMo. §§ 290.500(3).

116.    Plaintiffs and the class members are covered, non-exempt employees within the meaning of the Missouri Minimum Wage Law.  Accordingly, employees are entitled to be paid at least minimum wage for all hours worked in each workweek.  RSMo. § 290.502.1.

117.    Pursuant to the Missouri Minimum Wage Law, employees are also entitled to be compensated at a rate of not less than one and one-half times the regular rate at which such employees are employed for all work performed in excess of 40 hours in a workweek.  RSMo. § 290.505.1.

118.    Although the Missouri Minimum Wage Law contains some exceptions (or exemptions) from the minimum wage and overtime pay obligations, none apply here.  RSMo. § 290.500(3).

119.    Plaintiffs and the class members are victims of uniform and employer-based compensation policies, specifically, Defendants' illegal tip pooling. As described above, Defendants operated an illegal tip pool by including non-tipped and/or manager/supervisor employees in the tip pool.  As a result, Defendants may not claim a tip credit against their obligations to pay minimum wage.  Plaintiffs and other similarly situated employees are entitled

to recover from Defendants the amount of the sum of (1) the tip credit taken (i.e., the difference between the direct cash wage and the required Missouri minimum wage) / the amount of the unpaid minimum wages, and (2) all tips that were unlawfully kept by Defendants and then improperly redistributed as payment of PTO hours (and other forms of paid leave) accrued by Dual-Rate Supervisors in their employment as a floor supervisor.

120. Plaintiffs and the Class are entitled to damages equal to all unpaid regular and overtime wages due within three years preceding the filing of the Class Action Petition, plus periods of equitable tolling, along with an additional amount as treble damages, less any amount actually paid to the employees by Defendants. RSMo. § 290.527.

121. Plaintiffs and the Class are also entitled to an award of pre-judgment and post-judgment interest at the applicable legal rate.

122. Defendants are also liable to Plaintiffs and the Class for costs and reasonable attorney fees incurred in this action. RSMo. § 290.527.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

    a. class action certification of Plaintiffs' MMWL claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

    b. damages for unpaid minimum wages and overtime under RSMo. § 290.527;

    c. reasonable attorneys' fees under RSMo. § 290.527;

    d. treble damages, liquidated damages, and/or pre-judgment interest pursuant to the MMWL under RSMo. § 290.527;

    e. costs of suit under RSMo. § 290.527; and

    f. any further relief that the Court may deem just and equitable.

34

## COUNT V

### Breach of Contract

### Gaming License Deduction Policy

### (All Plaintiffs assert this claim against all Defendants)

123.  The preceding paragraphs are incorporated by reference as if fully alleged herein.

124.  Defendants entered into a contract with Plaintiffs and all similarly situated employees through which it agreed that employees would get paid an agreed-upon hourly rate for every hour worked during their employment.

125.  Defendants breached this contract by failing to pay Plaintiffs and all others similarly situated their agreed-upon hourly rate for every hour worked during their employment.

126.  Specifically, Defendants reduced Plaintiffs' and other similarly situated employees' wages by deducting the cost of the gaming license from their wages, which is not permitted by the contract. This constitutes a breach of Defendants' employment contract with Plaintiffs and other similarly situated employees.

127.  Because of Defendants' breach, Plaintiffs and other similarly situated employees have been damaged.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

a.  class action certification of Plaintiffs' breach of contract claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

b.  compensatory damages for breach of contract; and

c.  any further relief that the Court may deem just and equitable.

35

## COUNT VI

### Unjust Enrichment/Quantum Meruit

**Gaming License Deduction Policy**

**(All Plaintiffs assert this claim against all Defendants)**

128.   Defendants benefited from the work performed by Plaintiffs and other similarly situated employees during the work weeks when Defendants deducted the costs of gaming licenses from Plaintiffs' and other similarly situated employees' wages.  In deducting the costs for gaming licenses from Plaintiffs' and other similarly situated employees' wages, Defendants were receiving a benefit (the work) for which it had not paid wages due and owing.

129.   Defendants were aware or should have been aware that they were receiving the benefit of this unpaid work at the time the work was being performed and accepted and retained that benefit without paying fair compensation for the same.

130.   Defendants' acceptance and retention of the benefit of Plaintiffs and the other similarly situated employees' unpaid labor was inequitable and resulted in Defendants being unjustly enriched.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and on behalf of all similarly situated employees awarding the following relief:

    a. class action certification of Plaintiffs' unjust enrichment claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

    b. compensatory damages for breach of contract; and

    c. any further relief that the Court may deem just and equitable.

36

<u>**COUNT VII**</u>

<u>**Violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132**</u>

**Unlawful Wellness Program that Discriminates Based on an Impermissible Health Factor**

**(Plaintiffs Hammond and Layton assert this claim against Defendant PNG)**

131.    ERISA § 702, 29 U.S.C. § 1182, prohibits group health plans from discriminating against individuals in eligibility and continued eligibility for benefits and in individual premium or contribution rates on the basis of any health-status related factor.

132.    The regulations in effect at 29 C.F.R. § 2590.702(f)(4) for an outcome-based wellness program based on an individual satisfying a standard that is related to a health factor, require, among other things, that the following two factors be met in order for the outcome-based wellness program to satisfy an exception to the general prohibitions against discrimination on the basis of any health-status related factor:

      a.    "The **full reward** under the outcome-based wellness program must be available to all similarly situated individuals", which means that the wellness program must allow "a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual who does not meet the initial standard based on the measurement, test, or screening" (29 C.F.R. § 2590.702(f)(4)(iv)(A) (emphasis added); and

      b.    "The plan or issuer must disclose in all plan materials describing the terms of an outcome-based wellness program . . . the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard) . . . [unless] plan

materials merely mention that such a program is available, without describing its terms . . . ." (*Id.* § 29 C.F.R. § 2590.702(f)(4)(v)).

133. Defendant PNG sponsors a group health insurance plan for its employees within the meaning of ERISA. *See* 29 U.S.C. §§ 1182, 1191b(a)(1).

134. As a part of this group health insurance plan, Defendant PNG penalizes participants (and their dependents) who have used tobacco products within the prior three months of enrollment $50 per month (for one tobacco user) or $100 per month (for two tobacco users). Defendant PNG refers to this as the Tobacco Surcharge.

135. Plaintiff Hammond participated in Defendant PNG's group health insurance plan from (at least) 2014 through 2020. In each plan year, Plaintiff Hammond was subject to the Tobacco Surcharge. For example, in 2020, Defendant PNG charged Plaintiff Hammond $184.64 in Tobacco Surcharges through September 3, 2020.

136. Plaintiff Layton participated in Defendant PNG's group health insurance plan from (at least) 2014 through the present. In each plan year, Plaintiff Layton was subject to the Tobacco Surcharge. For example, in 2019, Defendant PNG charged Plaintiff Layton $577.00 in Tobacco Surcharges through December 13, 2019. Plaintiff Layton remains a participant in PNG's group health insurance plan today, and remains subject to the Tobacco Surcharge.

137. As explained below, Plaintiffs Hammond and Layton and all other employees subject to the Tobacco Surcharge at Defendant PNG's casino properties around the country were not offered the full reward of the wellness program because the tobacco cessation program only applied to the Tobacco Surcharge on a prospective basis (*i.e.*, an employee who successfully completes the tobacco cessation program does not receive reimbursement for the previously paid Tobacco Surcharge). As a result, Defendant PNG did not offer Plaintiffs Hammond and Layton

and all other similarly situated employees a reasonable alternative to the Tobacco Surcharge and violated ERISA's fiduciary duties.

138.    The Tobacco Surcharge is premised on a health-status related factor (*i.e.*, tobacco use) within the meaning of ERISA.  This means the Tobacco Surcharge is an outcome-based wellness program within the meaning of ERISA. *See* 29 U.S.C. §1182(1)(a); 29 C.F.R. § 2590.702(f)(1)(v).

139.    Because the Tobacco Surcharge is an outcome-based wellness program under ERISA, it must provide a reasonable alternative to all similarly situated participants who do not meet the original criteria (*i.e.*, they use tobacco products). *See* 29 C.F.R. § 2590.702(f)(4)(iv)(A).

140.    ERISA's interpreting regulations provide an example of a reasonable alternative for an outcome-based wellness program involving a tobacco surcharge:

> **Example 6 - Tobacco use surcharge with smoking cessation program alternative**.
>
> (i) Facts. In conjunction with an annual open enrollment period, a group health plan provides a premium differential based on tobacco use, determined using a health risk assessment. The following statement is included in all plan materials describing the tobacco premium differential: "Stop smoking today! We can help! If you are a smoker, we offer a smoking cessation program. If you complete the program, you can avoid this surcharge." The plan accommodates participants who smoke by facilitating their enrollment in a smoking cessation program that requires participation at a time and place that are not unreasonably burdensome or impractical for participants, and that is otherwise reasonably designed based on all the relevant facts and circumstances, and discloses contact information and the individual's option to involve his or her personal physician. The plan pays for the cost of participation in the smoking cessation program. Any participant can avoid the surcharge for the plan year by participating in the program, regardless of whether the participant stops smoking, but the plan can require a participant who wants to avoid the surcharge in a subsequent year to complete the smoking cessation program again.
>
> (ii) Conclusion. In this Example 6, the premium differential satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v). The program is an outcome-based wellness program because the initial standard for obtaining a reward is dependent on the results of a health risk assessment (a measurement, test, or

screening). The program is reasonably designed under paragraph (f)(4)(iii) because the plan provides a reasonable alternative standard (as required under paragraph (f)(4)(iv) of this section) to qualify for the reward to all tobacco users (a smoking cessation program). The plan discloses, in all materials describing the terms of the program, the availability of the reasonable alternative standard (including contact information and the individual's option to involve his or her personal physician). Thus, the program satisfies the requirements of paragraphs (f)(4)(iii), (iv), and (v) of this section.

*See* 29 C.F.R. § 2590.702(f)(4)(vi) at Example 6.

141. ERISA's interpreting regulations provide two examples of unreasonable alternatives for an outcome-based tobacco cessation wellness program that do not satisfy ERISA:

**Example 7 - Tobacco use surcharge with alternative program requiring actual cessation.**

(i) Facts. Same facts as Example 6, except the plan does not provide participant F with the reward in subsequent years unless F actually stops smoking after participating in the tobacco cessation program.

(ii) Conclusion. In this Example 7, the program is not reasonably designed under paragraph (f)(4)(iii) of this section and does not provide a reasonable alternative standard as required under paragraph (f)(4)(iv) of this section. The plan cannot cease to provide a reasonable alternative standard merely because the participant did not stop smoking after participating in a smoking cessation program. The plan must continue to offer a reasonable alternative standard whether it is the same or different (such as a new recommendation from F's personal physician or a new nicotine replacement therapy).

**Example 8 - Tobacco use surcharge with smoking cessation program alternative that is not reasonable.**

(i) Facts. Same facts as Example 6, except the plan does not facilitate participant F's enrollment in a smoking cessation program. Instead the plan advises F to find a program, pay for it, and provide a certificate of completion to the plan.

(ii) Conclusion. In this Example 8, the requirement for F to find and pay for F's own smoking cessation program means that the alternative program is not reasonable. Accordingly, the plan has not offered a reasonable alternative standard that complies with paragraphs (f)(4)(iii) and (iv) of this section and the program fails to satisfy the requirements of paragraph (f) of this section.

*See* 29 C.F.R. § 2590.702(f)(4)(vi) at Examples 7-8.

40

142.    In this case, Defendant PNG's Tobacco Surcharge is plainly an outcome-based wellness program.  However, Defendant PNG does not offer a reasonable alternative for all similarly situated employees in violation of ERISA. *See* 29 U.S.C. § 1182; 29 C.F.R. § 2590.702(f)(4).

143.    Since, at least, 2014, PNG's health plan included a Tobacco Surcharge for employees enrolled in company-sponsored medical coverage who have used tobacco products within the last three months or have participating dependents who have used tobacco products within the last three months.  Since 2019, the Tobacco Surcharge has been $23.08 per bi-weekly pay period ($50 per month) for one tobacco user, and $46.15 per bi-weekly pay period ($100 per month) for two tobacco users.

144.    As part of its Tobacco Surcharge, Defendant PNG requires its employees to complete a Tobacco User Affidavit.  Defendant PNG requires its employees to complete the Tobacco User Affidavit annually when the open enrollment in their health insurance plan begins.  In addition, if an employees' (or their dependents') tobacco status changes, they are required to notify PNG and submit a revised Tobacco User Affidavit.

145.    According to PNG's outcome-based wellness program, if employees or their dependents enroll in a smoking cessation program, they are eligible to have the Tobacco Surcharge removed upon completion of the smoking cessation program, and the submission of an updated Tobacco User Affidavit.  But any adjustments by PNG are on a *prospective* basis only – there are no retroactive adjustments to the tobacco user surcharge.

146.    In order to satisfy the requirement to provide a reasonable alternative standard, the same, *full reward* must be available under the wellness program to individuals who qualify by satisfying a reasonable alternative standard (*i.e.*, completing the tobacco use cessation program)

41

as is provided to individuals who qualify by satisfying the program's otherwise applicable standard (*i.e.*, not a tobacco user). Accordingly, while an employee may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)

147.    Although plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period before an alternative was satisfied (*e.g.*, payment for the retroactive period or pro rata over the remainder of the year) as long as the method is reasonable and the individual receives *the full amount of the reward*.

148.    Because PNG refuses to make retroactive adjustments to the tobacco user surcharge, employees will not receive the full amount of the reward. The tobacco surcharge will only be removed after completion of the smoking cessation program (and submission of an updated Tobacco User Affidavit) through the remainder of the plan year. As a result, that individual would not receive the full reward as is provided to individuals who meet the initial standard for that plan year (e.g., non-smoker not subject to the tobacco user surcharge).

149.    Through the above-described outcome-based wellness program, PNG has failed to satisfy the requirement to provide a reasonable alternative standard. Because Defendant PNG failed to offer a reasonable alternative standard for the Tobacco Surcharge, it has operated an illegal wellness program under ERISA because it discriminates on the basis of a health-status related factor (namely, tobacco use).

42

150.     As a result, PNG's imposition of the Tobacco Surcharge violated 29 U.S.C. § 1182, and its collection of the proceeds resulted in it receiving windfall profits in violation of the law, as the receipt of additional funds reduced its own costs associated with funding the plan and forestalled its own obligations to make contributions thereto. PNG thus enriched itself at the expense of its plan's participants.

151.     Plaintiffs and the class are authorized to bring suit pursuant to 29 U.S.C. § 1132(a)(2) because they have alleged that PNG has breached its fiduciary duties as outlined herein.

152.     Plaintiffs and the class are authorized to bring suit pursuant to 29 U.S.C. § 1132(a)(3) because they have alleged statutory violations of ERISA and seek appropriate equitable relief to redress said violations.

153.     Defendant PNG has breached its fiduciary duties under ERISA to participants in the plan because it:

a.     failed to act solely in the interest of the participants and beneficiaries of the health plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(A);

b.     failed to discharge its duties in accordance with the documents and instruments governing the health plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(D);

c.     caused the health plan to engage in transactions that Defendant PNG knew or should have known constituted a direct or indirect transfer to, or use by

43

or for the benefit of, a party in interest, of assets of the health plan, in violation of ERISA. *See* 29 U.S.C. § 1106(a)(1)(D);

d.  dealt with assets of the health plan in Defendant PNG's own interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

e.  acted on behalf of a party whose interests are adverse to the interests of the health plan or the interests of its participants and beneficiaries, in violation of ERISA. *See* 29 U.S.C. § 1106(b)(2); and

f.  jointly with the health plan, caused the health plan to require participants to pay a premium or contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the health plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the health plan as a dependent of the individual, in violation of ERISA. *See* 29 U.S.C. § 1182(b).

154.  As a result of its breach of fiduciary duties under ERISA, Defendant PNG must return all Tobacco Surcharges it obtained from its employees.

**WHEREFORE**, Plaintiffs Hammond and Layton request the Court enter judgment for Plaintiffs Hammond and Layton, both individually and on behalf of all similarly situated employees awarding the following relief:

a.  class action certification of Plaintiffs Hammond and Layton's ERISA claim and an order appointing Stueve Siegel Hanson LLP and McClelland Law Firm, P.C. as class counsel;

b.  requiring Defendant PNG to reimburse all participants who paid the Tobacco Surcharge from October 1, 2014, through the present plus interest;

c. requiring Defendant PNG to revise any Tobacco Surcharge Wellness Program it intends to maintain to comply with ERISA § 702, 29 U.S.C. § 1182, and its implementing regulations;

d. enjoining Defendant PNG from collecting Tobacco Surcharges until Defendant PNG revises its Tobacco Surcharge Wellness Program to comply with ERISA § 702, 29 U.S.C. § 1182, and its implementing regulations;

e. imposing a constructive trust on profits received by PNG as a result of fiduciary breaches committed by it or for which it is liable, upon which Plaintiffs and members of the class can make claims for equitably vested benefits;

f. requiring Defendant PNG to disgorge all unjust enrichment or profits received as a result of fiduciary breaches committed by it or for which it is liable;

g. Imposing the equitable remedy of surcharge and requiring PNG return all funds it derived from the illegal Tobacco Surcharge;

h. awarding Plaintiffs Hammond and Layton's counsel attorneys' fees and costs consistent with ERISA's fee and cost shifting provisions for the costs of prosecuting this action; and

i. any further relief that the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 26, 2021                    Respectfully submitted,

                                            **STUEVE SIEGEL HANSON LLP**

                                            */s/ Caleb Wagner*
                                            George A. Hanson, MO. Bar No. 43450
                                            Alexander T. Ricke, MO. Bar No. 65132
                                            Caleb Wagner, MO Bar No. 68458
                                            460 Nichols Road, Suite 200
                                            Kansas City, Missouri 64112
                                            Telephone:    (816) 714-7100
                                            Facsimile:    (816) 714-7101
                                            hanson@stuevesiegel.com
                                            ricke@stuevesiegel.com
                                            wagner@stuevesiegel.com

                                            **McCLELLAND LAW FIRM, P.C.**
                                            Ryan L. McClelland, MO Bar No. 59343
                                            Michael J. Rahmberg, MO. Bar No. 66979
                                            The Flagship Building
                                            200 Westwoods Drive
                                            Liberty, Missouri 64068-1170
                                            Telephone:    (816) 781-0002
                                            Facsimile:    (816) 781-1984
                                            ryan@mcclellandlawfirm.com
                                            mrahmberg@mcclellandlawfirm.com

                                            **COUNSEL FOR PLAINTIFF**


                              **CERTIFICATE OF SERVICE**

        The undersigned certifies that on February 26, 2021 the foregoing document was filed with
the Court's CM/ECF system, which served a copy of the foregoing document on all counsel of
record.

                                            */s/ Caleb Wagner*
                                            Counsel for Plaintiff